[Civ. No. 5013. Third Appellate District.—March 22, 1935.]

CORPORATION OF AMERICA (a Corporation), Respondent, v. A. HARRIS et al., Defendants; BERRY INVESTMENT COMPANY (a Corporation), Appellant.

454

Herbert Choynski and Anson H. Morgan for Appellant.

White, Miller, Needham, Harber & Mering and Keyes & Erskine for Respondent.

WOODWARD, J., *pro tem.*—The sole question presented by this appeal is whether the appellant Berry Investment Company, a corporation, is liable for unpaid rentals under the terms of a written lease wherein respondent is named as lessor and A. Harris as lessee. Appellant's name does not appear in the instrument nor is Harris designated therein as an agent or trustee. The trial court found, however, that Harris had acted for himself and also as an agent of appellant corporation. Judgment was accordingly entered against both defendants for accrued rentals and possession of the premises. Harris did not appeal.

While novel in several of its aspects, the case it not factually involved. Following oral negotiations, which we will presently discuss, the lease was executed by the parties on July 16, 1929, the property described being situate in the city of Sacramento and informally referred to at the trial as the "Hotel Senator Garage". The term was for four years and the rentals $1,000 a month up to July 16, 1930, and $1,100 a month thereafter for the remainder of the term. Appellant corporation immediately took possession of the premises, conducted a general garage business therein and paid the rentals provided for until February 16, 1931, at

which time there was a default. Thereafter respondent commenced the present action for unlawful detainer and appellant appeared and defended on the single ground that it was not a party to the lease but merely a subtenant of Harris.

Findings of the trial court as to Harris' representative capacity are based largely, if not entirely, on the testimony of Hilliard E. Welch, who was vice-president of the Bank of America and admittedly possessed of the requisite authority to act for respondent corporation. In view of this fact, Welch's version of conversations with B. S. Berry and A. Harris, president and secretary respectively of the Berry Investment Company, during the period when negotiations were in progress, should be noticed with some particularity.

According to this witness, he talked with W. W. Polley and learned that "the Berrys" were interested in taking over Polley's lease on the garage. "Three or four days later," testified the witness, "I talked with Mr. Berry about it and negotiations going backwards and forwards, and finally one morning I was called down to the Berry Hotel; Mr. Polley, Mr. Berry and Mr. Harris were there. Mr. Berry introduced Mr. Harris as his local representative. I am not sure whether I had met Mr. Harris prior to that morning or not; I had talked with Mr. Berry a number of times. . . . In a general way, the arrangement I made with Mr. Berry was, Mr. Berry stated that they were forming a corporation to whom the lease would run and that as we were all desirous of closing the matter up in as quick time as possible the best way would be to have the lease run to Mr. Harris with the assurance that they would be able to transfer to the Berry Investment Company as soon as the corporation papers had been filed and the formation of the corporation completed. They wanted the lease to run to Mr. Harris and it was understood that it would be assumed by the Berry Investment Company as soon as the corporation was formed—I don't know what the legal term is, but until the thing could be brought to life, or could be made legal. I had not investigated Mr. Harris as to his desirability as a tenant and I did not know anything about the Berry people except casually. I did know of their local operations and of the properties they were interested in at Sacramento." On cross-examination the witness ad-

mitted the terms of the lease were agreed upon before there was any serious or other discussion of the Berry corporation.

Contemporaneously with the transaction, cash in the sum of $1,604.03 was exacted by the bank. Welch testified that the money was paid with two checks of the Berry Investment Company; that thereafter appellant paid the monthly rental with checks issued under the corporate name and signed by Harris. The account was carried on the books of the bank in the name of Berry Investment Company and the Corporation of America. After the execution of the lease it seems that there were immediate discussions concerning a reduction in the rent. These negotiations, so Welch testified, were carried on by Berry and Harris with several officers of the bank. Ultimately the bank agreed to a monthly rebate of $200 and gave a cashier's check for said amount upon the payment of each installment of rent. The rebate checks were made payable to the Berry Investment Company and were usually handed to Harris personally. Receipts for the rent were also made out to appellant corporation. Harris made no objection, so far as the witness knew, to the form of the checks or receipts, nor in his dealings with the bank did he ever claim to be the actual tenant.

G. L. Pape, an officer of the respondent corporation in 1929, testified that Berry had conferred with him concerning a reduction in the rent and that the discussion grew heated; that all his negotiations were with Berry. Said this witness: "I never knew Mr. Harris in the matter at all. We made some repairs for Mr. Berry, put in an office and rest room under his directions entirely and conferred with him on rental reductions. Mr. Berry used to come in to see me quite frequently on matters in connection with the lease." Both Berry and Harris denied there had been any discussion with Welch concerning an arrangement under which Harris was to be a figurehead in the transaction. Harris claimed he had leased the garage solely for his individual benefit and later sublet it to appellant corporation. He denied that the Berry Investment Company was in existence when he executed the lease, or that the company made the first payments under the lease—claims which, it seems, were refuted by documentary evidence. In substantiation of his assertion

that appellant corporation had occupied the premises only as a subtenant, he produced a certain writing bearing date of August 21, 1929, and purporting to be a partnership agreement between himself and the Berry Investment Company. The writing was in the form of a letter signed by Harris with an acceptance indorsed thereon by the Berry Investment Company, "by B. S. Berry, president". Under the terms of this agreement Harris turned over to the corporation all personal property "on hand at said garage" and agreed that appellant should manage and conduct the business, paying to him one-third of the net profits. The agreement was revocable "by either party at any time" and there was no mention therein of the lease. The trial court refused to consider the writing as an assignment of the lease and made a specific finding to that effect. Furthermore, the court accepted the testimony of Welch and rejected that of appellant's witnesses. ■ It is scarcely necessary to add that a judgment cannot be reversed on appeal merely because the preponderance of the evidence may appear to be on the side of one party or the other, but only where there is a total absence of competent evidence to sustain a material finding. (*Jennings* v. *Weibel*, 204 Cal. 488 [268 Pac. 901]; *Thoele* v. *Thoele*, 102 Cal. App. 387 [282 Pac. 1001].)

For reversal of the case appellant urges, among other things, (1) "That there is no evidence of authorization or subsequent ratification by appellant of the acts of B. S. Berry or A. Harris; (2) that appellant is not bound by a lease in the absence of either authority in writing or subsequent ratification in writing."

Assuming as we must, since the trial court so found, that Harris executed, or attempted to execute, the lease as an agent of appellant corporation as well as for himself, we are now confronted only with the question of his legal capacity to perform such act. Berry, it may be observed preliminarily, denied emphatically that the board of directors of his corporation (consisting of himself, his wife and Harris) had ever passed a resolution authorizing him to negotiate the lease in question. The record shows that appellant was incorporated in Nevada on July 12, 1929, the incorporators and directors being B. S. Berry, Clara G Berry and A. Harris. The articles of incorporation do not

appear in the record, nor is there any evidence therein as to the authority of Berry and Harris concerning matters pertaining to the corporate business.

It is true, as pointed out by respondent's counsel, that a disclosed principal may be held liable on contracts made in the name of the agent unless the circumstances, or terms of the contract, show an intent by the other party to take the agent alone as his debtor. The contrary rule, found in the case of *Ferguson* v. *McBean,* 91 Cal. 73 [27 Pac. 518, 14 L. R. A. 65], is seemingly no longer followed in this state. (*Geary Street etc. R. R. Co.* v. *Rolph,* 189 Cal. 59 [207 Pac. 539]; *Pacific Ready-Cut Homes* v. *Seeber,* 205 Cal. 690 [272 Pac. 579]; Restatement of the Law, Agency, sec. 140.) But the doctrine may not be invoked in violation of the statute of frauds. Sections 1624 and 2309 of the Civil Code prohibit the leasing of real property by an agent, for longer than a year, unless the authority of the agent is in writing subscribed by the party sought to be charged. In the instant case it is not contended that either Berry or Harris had written authority to bind the corporation. Respondent urges, however, that there are two exceptions to the requirement: one when the execution of the instrument by the agent is in the presence of the principal, in which event it is deemed the act of the latter; and the other, when the agent is an executive officer of the corporation for which he attempts to act. The first so-called exception need not be noticed since appellant is a corporation and could not be deemed to have been present. The second is found in 1 California Jurisprudence, at page 730, and seems to be based on the case of *McCartney et al.* v. *Clover Valley Land & Stock Co.,* 232 Fed. 697, wherein we find this language: "In our judgment section 2309 of the Civil Code, requiring an agent's authority to execute a contract in writing to be itself in writing, does not apply to the executive officers of a corporation." The court added, however, but not necessarily in qualification of the rule, that it should be established that the making of such contract was within the scope of the officer's authority. On the other hand, it has repeatedly been held in California that the president of a corporation has no authority, by virtue of his office alone, to bind the corporation by contract. This, it was declared in *Black* v. *Harrison Home Co.,* 155 Cal. 126,

127 [99 Pac. 494], "is an elementary principle of corporation law". Nor may the business agent of a corporation, in violation of the statute of frauds, execute a note on behalf of his principal without appropriate resolutions of the board of directors authorizing him so to do. (*Wood Estate Co.* v. *Chanslor*, 209 Cal. 241, 249 [286 Pac. 1001]; see, also, *Standard Livestock Co.* v. *Bank of California*, 67 Cal. App. 381 [227 Pac. 962]; *Campbell* v. *Hanford*, 67 Cal. App. 155, 162 [227 Pac. 234]; *Pacific Bank* v. *Stone*, 121 Cal. 202 [53 Pac. 634]; *Blood* v. *La Serena Land & Water Co.*, 113 Cal. 221 [41 Pac. 1017, 45 Pac. 252].) The weight of authority, we believe, supports the view that the agent of a corporation, whether he be an executive officer or not, may not, merely because of his office, bind his principal upon a lease of real property for longer than a year, unless he has written authority from his principal so to do.

■ But the crucial point in this case is not whether Berry and Harris were legally authorized to bind appellant corporation, but whether the latter, under all the facts and circumstances of the transaction, is in a position to avail itself of the statute of frauds as an avenue of escape from liability. Even in cases where the elements of ostensible agency are absent, or where the acceptance of the benefits of an unauthorized contract does not constitute ratification, a principal is sometimes estopped from using the statute as a shield. Ratification and estoppel, it may be observed parenthetically, are not interchangeable terms. The former is strictly governed by code provisions, while the latter is of equitable cognizance. (*Blood* v. *La Serena L. & W. Co., supra.*) In the instant case, while ratification of the lease could have been made only in the manner necessary to confer original authority for the act ratified (Civ. Code, sec. 2309), it does not necessarily follow that estoppel is inapplicable. In fact, it is only when the acts, such as voluntary acceptance of the benefits, are legally ineffectual to constitute ratification that there is any necessity for invoking the doctrine of estoppel.

■ Does the evidence sustain estoppel? Practically, Berry said to the bank's officer: "We are organizing a corporation and Harris is our local representative. We want to lease your garage but cannot do so because of present legal incapacity. In order to circumvent this difficulty and

close the deal at once we propose that the lease should run to Harris until the corporation completes its organization.'' Whether the bank's officer asked questions about the status of the corporation immediately following the proposal or a few hours later, is immaterial. Suffice it to say that the proposal was accepted and the conduct of the parties thereafter is peculiarly consistent with the alleged arrangement. The evidence does not clearly reveal just how far the corporation had progressed in its organization at the time the lease was being negotiated, but it had attained the status of a foreign corporation when the contract was formally executed. Four days later it qualified to do business in California. Upon execution of said lease appellant immediately took possession of the garage and thereafter, through its president and secretary, dealt with respondent on the basis of the original understanding. Berry demanded and received certain alterations and improvements in the building, together with a substantial reduction in the rent. Rent receipts and rebate checks were issued to the Berry Investment Company and the account at all times was carried on the books of the bank in the name of appellant corporation. It is true, as suggested by appellant's counsel, that one who accepts the benefits of a transaction is not usually estopped to plead lack of authority on the part of the agent unless he was cognizant of all the facts, and also of his own rights in the premises. On the other hand, there is authority for the statement that long acquiescence with respect to the benefits and obligations of a contract may, in some instances, serve as a substitute for knowledge of the facts at the outset. (Bigelow on Estoppel, 6th ed., 765.) And while the rule is encountered largely in boundary line disputes, it is not necessarily confined thereto. In the case of *New Blue Point Min. Co.* v. *Weissbein,* 198 Cal. 261, 269 [244 Pac. 325, 45 A. L. R. 781], wherein the validity of a trust deed was attacked on the ground that the resolution authorizing it was defective, the Supreme Court held that if timely objections to the deed had been made by the corporation it would have been declared void, but that long acquiescence in the conduct of the trustees rendered the objection ineffectual. (See, also, *Standard Oil Co.* v. *Slye,* 164 Cal. 435 [129 Pac. 589]; *Gribble* v. *Columbus Brewing Co.,* 100 Cal. 67 [34 Pac. 527].) Even if appellant corporation, as such,

had no knowledge of the negotiations between Berry and Welch at the time of their occurrence, it does not seem probable, in the circumstance iterated, that it could have occupied the garage for more than a year and a half without being fully advised of what its president and secretary had done in the preliminary stages of the transaction.

Appellant urges also that respondent does not claim to have been deceived in any manner, or that Welch was ignorant of the true state of facts. Estoppel is not dependent upon precedent, deceit nor upon a corrupt motive or evil design. (*Seymour* v. *Oelrichs*, 156 Cal. 782, 796, 797 [106 Pac. 88, 134 Am. St. Rep. 154].) Welch, the evidence discloses, accepted the proposal of Berry and changed his position by canceling the lease with Polley. It may be assumed that he considered the change advantageous to the bank or he would not have made it.

Factually the case is similar to *Feeney* v. *Clapp*, 126 Cal. App. 729 [15 Pac. (2d) 178]. There a lease was entered into by Margaret Feeney as lessor and W. O. Clapp, as lessee. The former believed that the firm of F. H. Woodruff & Sons was the real party at interest, a member of said firm having advised Mrs. Feeney's agent that it would be convenient to name Clapp as lessee and that the latter would be given written authority to act. The authority was not given and in a suit against the firm to recover installments of rent the plaintiff prevailed. The doctrine of estoppel was invoked to sustain the judgment and, in commenting on the subject, the appellate court says: "The firm members claim that the contract alleged was within the statute of frauds, and consequently that they are not bound, but it is plaintiff's position that they are estopped to assert the statute. On this question the finding was that defendant Woodruff immediately after the execution of the lease entered into possession, paid the rent and received the crops and other benefits thereunder; and this finding is also supported. Although a contract may be within the statute of frauds, yet if the conduct of the party relying thereon has been such as to raise an equity outside of and independent of the contract he may be estopped to make that defense." (See, also, *Schlesinger & Sons* v. *Kohler & Chase*, 103 Cal. 195 [284 Pac. 244]; *Wood Estate Co.* v. *Chanslor, supra.*)

■ Appellant's claim that estoppel must be pleaded is without merit. It has been held that when the doctrine is relied upon as a defense, it must be pleaded if there is an opportunity to do so (*Peerless Motor Co.* v. *Sterling F. Corp.*, 139 Cal. App. 621 [34 Pac. (2d) 738]); but the rule does not apply to a plaintiff's pleadings. (*McCreery* v. *Charlton*, 185 Cal. 37 [195 Pac. 670]; *Llewellyn Iron Works* v. *Abbott Kinney Co.*, 172 Cal. 210 [155 Pac. 986].) The court, however, must make a finding on estoppel when its decision is based thereon, which finding is sufficient if it recites facts from which an estoppel necessarily follows. (*Zenos* v. *Britten-Cook Land etc. Co.*, 75 Cal. App. 299 [242 Pac. 914].) In the instant case evidence of estoppel was received, seemingly without objection, and the findings of the court, while not as explicit on the subject as could be desired, set forth the fact that immediately upon the execution of the lease appellant entered into and took possession of the garage and paid the rent therefor as lessee "under the terms and provisions of the lease". Impliedly if appellant took possession and paid the rent it received the benefits of the contract.

■ Lastly, appellants contend that the court erred in computing the amount of rent, in that appellant is charged with seven and a fraction installments when only six could have been due under the terms of this lease. In this connection it is urged that a reasonable construction of the lease would require a finding that each installment was payable in advance. Although the contract is somewhat ambiguous and therefore may be susceptible to the construction contended for, we do not feel at liberty to consider the point for the reason that the parties stipulated during the trial "that the installments of rent which matured under the terms of the lease on the 16th days of February, March, April, May, June, July and August, were each of them unpaid . . . "

For the reasons stated the judgment is affirmed.

Pullen, P. J., and Thompson, J., concurred.